**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 09-cv-00453-CMA-CBS

ALAN C. IVAR, an individual,
DEBORAH L. IVAR, an individual, and
CLIFFORD A. BERNSTEIN, an individual,

       Plaintiffs,

v.

ELK RIVER PARTNERS, LLC, a Georgia limited liability company,
DMB REALTY LLC, a Delaware limited liability company, d/b/a Marabou Realty,
JEFFREY TEMPLE, an individual,
JOHN HILLENBRAND, an individual,
M & I MARSHALL and ILSLEY BANK, a Wisconsin Corporation, and
DOES 1-100,

       Defendants.

_____

**ORDER REGARDING MOTIONS TO DISMISS**
_____

This matter is before the Court on Defendants' Motion to Dismiss (Doc. # 14) and

Defendant M&I Bank's Motion to Dismiss on Additional Grounds (Doc. # 15). This

lawsuit stems from Plaintiffs Alan C. and Deborah Ivar and Clifford A. Bernstein's

purchase of undeveloped lots in a subdivision of Steamboat Springs, Colorado.

Plaintiffs contend that the sellers, Defendants Elk River Partners, LLC, DMB Realty

LLC, Jeffrey Temple, and John Hillenbrand, and the bank that offered financing in

connection with the purchase, Defendant M&I Bank, concocted a scheme to

fraudulently inflate the value of these properties.  Plaintiffs assert a host of federal and state law claims based on this conduct, each of which Defendants move to dismiss.

## I. <u>BACKGROUND</u>

**A.    FACTS**

For purposes of the motions, all well-pleaded facts in the amended complaint are assumed to be true, and all reasonable inferences therefrom are drawn in the light most favorable to Plaintiffs.

Defendants Elk River, DMB Realty, Temple, and Hillenbrand (the "Seller Defendants") are in the business of developing and selling expensive lots in a subdivision of Steamboat Springs, Colorado, known as Marabou Ranch.  (Doc. # 10 ¶ 18.)  Initial buyers of these lots were given purchase incentives, meaning they ended up paying far less than the listed sales price.  (*Id.* ¶¶ 19, 22.)  However, in order to boost the perceived value of the remaining properties, Seller Defendants publicly recorded the lots' pre-incentive prices rather than the lower, actual sales prices.  (*Id.* ¶¶ 19, 25.)  These recorded prices were $270,000 to $1,000,000 higher than what the buyers paid for the lots.  (*Id.* ¶ 25.)

Plaintiffs were identified as potential investors in Marabou Ranch.  (*Id.* ¶ 20.)  Seller Defendants flew them to Steamboat Springs via private jet, providing luxury accommodations while they contemplated a purchase.  (*Id.* ¶ 21.)  Seller Defendants told Plaintiffs that the lots they were considering contained a million dollars of "built in equity" as a result of the special, one-time "founder's prices" Plaintiffs would be

2

receiving.  (*Id.* ¶ 22.)  Seller Defendants failed to mention that all previous purchasers received similar financial discounts.  (*Id.*)

While in Steamboat Springs, Plaintiffs asked about the prior sales prices of comparable lots.  (*Id.* ¶ 23.)  In response, Seller Defendants disclosed the publicly recorded gross sales prices – not disclosing that these prices were inflated by several hundred thousand dollars over the actual amounts paid by previous buyers.  (*Id.*)  Indeed, when Defendant Hillenbrand was asked about the price of his property, he represented that he bought the lot for $2,000,000 when, in actuality, he paid half a million less.  (*Id.* ¶ 24.)  These misrepresentations were part of the arrangement to mislead Plaintiffs into thinking the lots were worth substantially more than they in fact were.  (*Id.* ¶ 25.)

Plaintiffs were also told, on numerous occasions, that their lots would appraise at the publicly recorded gross sales price rather than the discounted price they would be paying.  (*Id.* ¶ 32.)  These assertions seemed to corroborate the promises that the properties contained significant built in equity.  (*Id.*)  To prevent discovery of the fraud, Seller Defendants intentionally withheld the property appraisals, knowing that they would undermine Seller Defendants' statements about equity and value.  (*Id.*)

Not content to keep their scheme internal, Seller Defendants conspired with Defendant M&I Bank, whose officers were acquaintances of theirs.  (*Id.* ¶ 28.)  Plaintiffs were referred to M&I as a potential source of financing.  (*Id.*)  M&I's vice president, John Hicks, repeatedly told Plaintiffs that, if and when they wanted to build on the Marabou

Ranch lots, the bank would provide construction financing based on the publicly recorded value of the lots rather than the actual price paid. (*Id.*) These representations further convinced Plaintiffs that the lots were worth the recorded price. (*Id.*)

Given Defendants' sales pitch, Plaintiffs decided to invest. (*Id.* ¶¶ 29, 31, 35.) On January 30, 2007, the Ivars signed a purchase agreement for lot F7, paying $2,920,000. (*Id.* ¶ 29.) Consistent with their plan, Seller Defendants recorded the sales price as $3,650,000. (*Id.*) Similarly, on March 3, Mr. Bernstein purchased lot G3 for a price of $3,040,000. (*Id.* ¶ 30.) The sales price of the lot was recorded as $3,800,000. Some time after these purchases, Plaintiffs discovered that the lots had appraised for "significantly less" than the recorded value, notwithstanding Defendants' earlier representations. (*Id.* ¶ 33.) This lawsuit followed.

**B.     PROCEDURAL HISTORY**

Plaintiffs initially sued only Seller Defendants, asserting federal law claims for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Interstate Land Sales Full Disclosure Act, and the Securities Act of 1933, and state law claims for fraudulent misrepresentation, negligent misrepresentation, and violation of the Colorado Consumer Protection Act. (Doc. # 1.) Several weeks later, and before any defendant had answered, Plaintiffs filed an amended complaint adding M&I Bank as a party. (Doc. # 10.)

Defendants collectively moved to dismiss the claims against them. (Doc. # 14.) Defendant M&I Bank also filed a separate motion to dismiss, asserting arguments

particular to it. (Doc. # 15.) While these motions were pending, and prompted by M&I

Bank's initiation of foreclosure proceedings, the Ivars moved for a preliminary injunction

against M&I Bank. (Doc. # 46.) After full briefing and a hearing, the Court denied the

motion. As the Court understands it, the foreclosure proceeded as scheduled.

On December 2, 2009, the Court held a hearing on the motions to dismiss. At

that hearing, Plaintiffs conceded that their Securities Act claim was barred by the Tenth

Circuit's decision in *Woodward v. Terracor*, 574 F.2d 1023 (10th Cir. 1978). The Court

took the remaining claims under advisement, and now issues its ruling.

## II. <u>STANDARD OF REVIEW</u>

The Federal Rules of Civil Procedure provide that a defendant may move to

dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R.

Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh

potential evidence that the parties might present at trial, but to assess whether the

plaintiff's complaint alone is legally sufficient to state a claim for which relief may be

granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and

quotation marks omitted). A court reviewing the sufficiency of a complaint presumes

that the factual allegations are true and construes them in the light most favorable to the

plaintiff. *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).

The Supreme Court recently retired "the accepted rule that a complaint should

not be dismissed for failure to state a claim unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), abrogated by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). In *Twombly* and, more recently, *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009), the Court "prescribed a new inquiry for [courts] to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Twombly*, 550 U.S. at 570). "The Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." *Id.* (quoting *Twombly*, 550 U.S. at 570) (alterations omitted). "Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Id.* (emphasis in original).

While courts must still assume the truth of factual allegations, and may not dismiss a complaint "even if it strikes a savvy judge that actual proof of those facts is improbable," *Twombly*, 550 U.S. at 556, the Supreme Court made clear that the focus under Rule 12(b)(6) is on the well-pleaded facts. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1940. Moreover, "[a] pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do. Nor does the complaint suffice if it tenders 'naked

6

assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 1949 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

## III. <u>ANALYSIS</u>

Before the Court are both the collective motion to dismiss and Defendant M&I Bank's individual pleading. The Court first considers M&I's separate motion.

## A. CLAIMS AGAINST M&I BANK

Plaintiffs assert several causes of action against M&I: state law claims for fraudulent misrepresentation, negligent misrepresentation, and violation of the Colorado Consumer Protection Act; and a federal law RICO claim. (Doc. # 10 at 11, 16, 18, 20.)[1] Despite the variety of claims, Plaintiffs' allegations against M&I are strikingly singular. Plaintiffs contend that, prior to their purchase of the Marabou Ranch lots, M&I represented that it would provide financing for the construction of residences based on the recorded value of the lots rather than the lower purchase price. (Doc. # 10 ¶¶ 28, 31, 35, 39, 41, 47(b), 47(e), 54, 60, 83.) Plaintiffs claim that these representations were

---

[1] The amended complaint also includes, as a putative claim, "Injunctive Relief" against M&I. (Doc. # 10 at 22.) However, the "claim" does not outline an independent cause of action, but instead simply requests an injunction preventing M&I from foreclosing on the lots during the pendency of the litigation. (*Id.* ¶ 89.) The Court interprets this as a request for relief rather than a stand-alone claim or cause of action. At least as to the Ivars' property, the prior foreclosure appears to have mooted the request. To the extent that Plaintiffs believe they have grounds to seek an injunction during this litigation, nothing in this Order prevents them from doing so.

part of the broader scheme to dupe them into thinking the lots were worth this higher, recorded price.

M&I's motion to dismiss raises numerous defenses to these claims that, it contends, are clear from the face of the complaint. *See, e.g.*, *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1311 n.3 (10th Cir. 1999), *abrogated on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ("Rule 12(b)(6) is a proper vehicle for dismissing a complaint that, on its face, indicates the existence of an affirmative defense . . . ."). However, through the course of the briefing and hearings in this matter, one defense has come to the fore: M&I asserts that Plaintiffs' claims are barred by the Colorado Credit Agreement Statute of Frauds.

### 1. Statute of Frauds

The Colorado Credit Agreement Statute of Frauds provides that

> no debtor or creditor may file or maintain an action or a claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought.

Colo. Rev. Stat. § 38-10-124(2).

M&I's alleged promises to offer construction financing based on the recorded property value meet the statute's broad definition of a "credit agreement." *Id.* § 38-10-124(1)(a)(I) ("'Credit agreement' means . . . a contract, promise, undertaking, offer, or commitment to lend . . . to otherwise extend or receive credit, or to make any other financial accommodation[.]"); *see generally Schoen v. Morris*, 15 P.3d 1094, 1097

(Colo. 2000) ("Colorado cases applying the statute have adopted a broad definition of the term 'credit agreements.'").  As the recorded value of each property approached $4 million, the credit agreement also crosses the statute's $25,000 threshold.[2]  M&I's alleged promises make the bank a "creditor" for the purpose of the statute.  Colo. Rev. Stat. § 38-10-124(1)(b) ("'Creditor' means a financial institution which offers to extend, is asked to extend, or extends credit under a credit agreement with a debtor."); § 38-10-124(1)(d) ("'Financial institution' means a bank, savings and loan association, savings bank, industrial bank, credit union, or mortgage or finance company.").  Similarly, Plaintiffs are "debtors."  *Id.* § 39-10-124(c) ("'Debtor' means a person who or entity which obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor.").  There is no allegation that any of M&I's representations were "in writing and . . . signed by" M&I; Plaintiffs concede that the representations were made over the phone.  (Doc. # 23 at 14.)  Thus, the only issue in dispute is whether this lawsuit is one "relating to" these oral credit agreements.

Plaintiffs rightly note that their claims are not for the enforcement of any credit agreement, but rather focus on M&I's statements as part of Defendants' overall scheme.  (Doc. # 20 at 8-9.)  However, the statute is not limited to actions attempting to enforce

---

[2]  At the hearing on the motion to dismiss, Plaintiffs' counsel argued that the offer of financing was not an offer to *loan* the actual recorded value, i.e., $3.65 million for the Ivars' property and $3.8 million for Bernstein's property, but rather a representation that this recorded value would be used to *calculate* the amount of construction financing M&I would be willing to provide.  Plaintiffs' counsel suggested that the amount of construction financing would be less than the recorded value of the lots.  Even accepting that this is true, it is unreasonable to infer that the amount needed to construct a residence on a multi-million dollar lot would be less than $25,000.

an agreement's terms. Rather, the statute bars suits where there is no written credit agreement anytime an action "relat[es] to" that purported agreement. Colo. Rev. Stat. § 38-10-124(2). This is expansive terminology indeed. *See, e.g.*, Merriam-Webster's Collegiate Dictionary 1050 (11th ed. 2007) (defining "relate" to mean, *inter alia*, "to show or establish logical or causal connection between" and "to have relationship or connection"). The plain language therefore suggests that a lawsuit in which the critical allegations involve an oral promise to lend falls squarely within the statute's bounds. *See, e.g.*, *Schoen*, 15 P.3d at 1096-97 (in any matter of statutory interpretation, courts "strive to effectuate the intent of the legislature," which requires "look[ing] first to the plain language of the statute").

The legislative history supports this broad interpretation. The statute was enacted "in an effort to discourage lender liability litigation and to promote certainty into credit agreements." *Norwest Bank Lakewood, Nat'l Ass'n v. GCC P'ship*, 886 P.2d 299, 301 (Colo. App. 1995). "Specifically, by enacting the credit agreement statute of frauds, the legislature hoped to curtail suits against lenders based on oral representations made by members of the credit industry." *Schoen*, 15 P.3d at 1098 (citation omitted). This history "indicates an intent to impose a broad ban on claims arising from oral representations made by financial institutions." *Id.* at 1099.

Colorado courts have also noted the statute's extended breadth. For example, in *Norwest Bank Lakewood*, the Colorado court of appeals affirmed the dismissal of defendants' counterclaims against a bank for breach of good faith and fair dealing,

breach of fiduciary duty, and negligent misrepresentation arising out of the bank's oral

statements during negotiations to restructure defendants' debt. 886 P.2d at 300-01.

The court "reject[ed] defendants' argument that the statute does not preclude actions

sounding in tort," noting that

> [t]he plain language of the statute renders representations,
> warranties, or omissions in connection with credit
> agreements inoperative unless they are reduced to writing.
> Thus, as a matter of law, reliance upon such representations
> made in connection with negotiations for credit agreements
> or their waiver, modification, or extension can be neither
> reasonable nor justifiable.

*Id.* at 302.

Similarly, in *Hewitt v. Pitkin County Bank & Trust Co.*, 931 P.2d 456 (Colo. App.

1995), the Court of Appeals held that the statute required dismissal of the plaintiff's

breach of contract and various tort claims stemming from a bank's oral promises to

modify a promissory note. The court rebuffed the argument that the statute eliminates

only contract claims or tort claims seeking to *enforce* the underlying credit agreement.

*Id.* at 458 ("The language in § 38-10-124(2), which prohibits filing or maintaining an

action or a claim relating to an oral credit agreement is not limited by its terms to

contract claims or those tort claims which seek the enforcement of a credit agreement.")

(emphasis omitted). Rather, the court observed that the statute means what it says,

and bars "any tort claims relating to an oral credit agreement involving a principal amount exceeding $25,000." *Id.* at 459.[3]

Although none of these cases deal with the precise factual scenario presented here, their analysis of the comprehensive nature of the statute's prohibitions is clearly applicable. Plaintiffs' claims against M&I center on the allegation that the bank orally promised to extend credit. Given the plain language of the statute, confirmed by the legislative history and relevant case law, the Court is compelled to conclude that these claims "relat[e] to" a credit agreement. Plaintiffs' state law claims are therefore precluded by Colorado's statute of frauds.

M&I appears to assume the statute of frauds bars *all* claims against it – including the federal RICO claim. Although Plaintiffs do not argue this point, the Court cannot accept that a state statute of frauds bars a federal cause of action filed in federal court. Unlike the state law claims, the RICO cause of action is not before this Court on diversity jurisdiction or supplemental to a federal claim, requiring application of state

_____

[3] Other cases are in accord. *See, e.g.*, *Capital Investments-USA, Inc. v. Keybank Nat'l Ass'n*, No. 07-cv-334, 2008 WL 793534, *5 (D. Colo. March 24, 2008) ("The Colorado Credit Agreement Statute of Frauds precludes actions attempting to enforce an unsigned credit agreement . . . and any other claims relating to such an agreement."); *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 516 (Colo. App. 2006) ("In light of the purposes of the statute and its breadth, we do not perceive that an oral representation made by a member of the lending industry is excepted from the statutory bar if it is raised to avoid liability rather than to seek the recovery of damages."); *Schoen*, 15 P.3d at 1100 ("[T]he legislative history, the relevant case law, and public policy demonstrate the appropriateness of applying the statute broadly to bar suits based upon all oral promises to lend money . . . ."); *Univex Intern., Inc. v. Orix Credit Alliance, Inc.*, 914 P.2d 1355, 1358 (Colo. 1996) ("As the plain language of the statute indicates, section 38-10-124 does not apply only to claims involving transactions which are characterized exclusively as credit agreements, but also applies to claims which merely relate to credit agreements involving a principal amount exceeding $25,000.00.").

substantive law under the *Erie*[4] doctrine.  *See, e.g.*, *Felder v. Casey*, 487 U.S. 131, 151 (1988).  Rather, the RICO cause of action is a federal claim, which cannot be preempted by a state legislature.  *See, e.g.*, *Little Co. of Mary Hosp. and Health Care Centers v. Shalala*, 165 F.3d 1162, 1164 (7th Cir. 1999) ("But of course state law cannot preempt federal law."); *see also Markovich v. Vasad Corp.*, 617 F. Supp. 142, 146 (E.D. Pa. 1985) (state statute of frauds cannot bar plaintiff's federal securities claim).  Thus, while Plaintiffs' state law claims against M&I are barred by the statute of frauds, their federal RICO claim is not.  The Court next considers M&I's other arguments regarding Plaintiffs' RICO claim.

## 2.    Other Defenses

M&I contends that, under the doctrines of unclean hands and *in pari delicto*, Plaintiffs cannot challenge a scheme in which they took part.  (Doc. # 15 at 5-6.)  But the complaint does not allege that Plaintiffs were "in on" the broader scheme or intended to perpetrate a fraud on others.  At most, it asserts that Plaintiffs thought that they were getting a special incentive that no one else received and that they knew the recorded price on their lots did not reflect these incentives.  That, alone, does not rise to the level of bad faith or inequitable conduct required to bar Plaintiffs' claims.  Whether discovery sheds additional light on these defenses, suffice it to say that these defenses are not clear from the face of the complaint.  These doctrines may not, therefore, form

---

[4] *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

the basis for dismissal at this early stage of the litigation.  *Bullington*, 186 F.3d at 1311 n.3.

### 3.    Motion to Strike and for a More Definite Statement

M&I also moves to strike portions of Plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(f), and for a more definite statement pursuant to Fed. R. Civ. P. 12(e).  (Doc. # 15 at 9-10.)  Rule 12(f) permits the Court to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  It is not a mechanism for attacking a claim on the merits.  *See, e.g.*, 5C Charles A. Wright & Arthur R. Miller *Federal Prac. & Proc.* § 1380.  M&I cursorily asserts that the RICO claim is "wholly unsupportable."  Although not much of an argument, this volley goes to the merits of that claim and as such must be denied.  M&I also moves to strike material relating to punitive damages on the state law claims.  As those claims have already been dismissed, the Court finds this request to be moot.

Under Rule 12(e), an order for a more definite statement is appropriate only where a pleading is "so vague or ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e).  While perhaps not always drafted with crystalline precision, the amended complaint does not suffer from such blatant ambiguity.  Moreover, the moving party must "point out the defects complained of and the details desired," *id.*, which M&I fails to do in its brief.  For these reasons, the motion for a more definite statement is denied as well.

### 4. Request to Amend

Finally, Plaintiffs request a chance to amend their state law claims against M&I. (Doc. # 20 at 9.)  "The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, denial of leave is proper where the amendment would be futile.  *See Stafford v. Saffle*, 34 F.3d 1557, 1560 (10th Cir. 1994) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  As a written credit agreement is required to support Plaintiffs' claims against M&I, and as Plaintiffs concede that the relevant representations were made verbally by telephone, any attempt to amend would run up against this futility bar.  Leave to amend is therefore denied.

### B. CLAIMS AGAINST ALL DEFENDANTS

The Court now turns to the motion to dismiss filed by all Defendants.  The motion attacks each of Plaintiffs' claims on a variety of grounds, which the Court considers in turn.

### 1. RICO

Plaintiffs' complaint alleges that, by collaborating in a scheme to defraud potential purchasers to pay inflated prices for Marabou Ranch properties, and by using the mails to do so, Defendants violated the federal RICO statute.  RICO makes unlawful: investment of racketeering income in an "enterprise" engaged in interstate or foreign commerce, 18 U.S.C. § 1962(a); acquisition, through a pattern of racketeering activity, of an interest in any such enterprise, *id.* § 1962(b); participation, through a

pattern of racketeering activity, in the affairs of any such enterprise, *id.* § 1962(c); or

conspiracy to do any of the same, *id.* § 1962(d).[5]

Defendants attack the RICO claim on a number of fronts, including on standing

grounds.  Because the Tenth Circuit has indicated that standing under RICO is a

threshold jurisdictional matter, *Gillmor v. Thomas*, 490 F.3d 791, 797 (10th Cir. 2007),

the Court addresses that issue first.

### a.    Standing

Under RICO's civil remedies provision, 18 U.S.C. § 1964(c), "'a plaintiff has

standing to bring a RICO claim only if he was injured in his business or property by

reason of the defendant's violation of § 1962.'"  *Gillmor*, 490 F.3d at 797 (quoting *Deck*

*v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003)).  Plaintiffs contend that

they suffered the requisite injury when they purchased their lots expecting them to be

worth the recorded price, only to later discover that they appraised for "significantly

less."  (Doc. # 10 ¶ 33.)  As Defendants point out, however, there is no allegation that

---

[5]  The Court's RICO analysis is made more complicated than might normally be
necessary because Plaintiffs do not expressly state which sub-section(s) of RICO Defendants
violated.  *Cf. Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006) (noting that it is
"debatable" whether RICO's subsections should be analyzed in identical fashion, at least for
causation purposes).  However, Plaintiffs' complaint does assert that the Defendants
"conducted and participated, both directly and indirectly, in the conduct of an enterprise's affairs
through a pattern of racketeering activity."  (Doc. # 10 ¶¶ 40-41.)  This language tracks the text
of subsection (c), which prohibits "any person employed by or associated with any enterprise
engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or
participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of
racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  The Court therefore
construes the complaint to allege a violation of § 1962(c).

the properties were worth less than the amount actually paid. (Doc. # 14 at 6.) In other words, the alleged injury is not an actual, monetary loss; rather, it is a lost opportunity to realize a profit on their real estate. Defendants argue that, absent an actual loss on the deal, there is no RICO injury. Plaintiffs do not dispute this characterization of their injury theory. Instead, they argue that such a "lost investment bargain" is an injury under RICO, at least in Colorado. (Doc. # 23 at 9-13.) The Tenth Circuit has not weighed in on this specific question, but considering the basic RICO standing principles, along with persuasive authority from other jurisdictions, the Court finds that Defendants have the better argument.

Although RICO is to be read broadly, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985), "[t]he phrase 'business or property' also retains restrictive significance." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).[6] *See also DeMauro v. DeMauro*, 115 F.3d 94, 97 (1st Cir. 1997) ("But while RICO is to be construed broadly, *Sedima*, 473 U.S. at 498, 'injury to property' is not an infinitely elastic concept."). Such restriction "'helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff.'" *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (quoting *Steele v. Hospital Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994)). Thus, as a basic rule, injury to business or property "'requires proof of a concrete financial loss and not merely injury to a valuable intangible property

_____

[6] *Reiter* construed that phrase in the context of § 4 of the Clayton Act. However, the Supreme Court has "repeatedly observed . . . that Congress modeled [RICO's] § 1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act." *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 267 (1992).

interest.'"  *Maio*, 221 F.3d at 483 (quoting *Steele*, 36 F.3d at 70).  *See also McLaughlin*

*v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d. Cir. 2008) ("A plaintiff asserting a claim

under 18 U.S.C. § 1964(c) must allege *actual*, quantifiable injury.") (emphasis in

original); *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 728 (8th Cir. 2004) ("'[A] showing

of injury requires proof of concrete financial loss, and not mere injury to a valuable

intangible property interest.'" (quoting *Steele*, 36 F.3d at 70)); *In re Taxable Municipal*

*Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995) (noting that RICO does not protect an

"intangible property interest"); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir.

1998) ("Injury to mere expectancy interests or to an 'intangible property interest' is not

sufficient to confer RICO standing."); *In re Bridgestone/Firestone, Inc. Tires Products*

*Liability Litig.*, 155 F. Supp. 2d 1069, 1090 (S.D. Ind. 2001) ("Federal courts have

consistently and repeatedly held that to satisfy the injury requirement of section 1964, a

plaintiff must prove an actual, concrete, monetary loss.").

     In light of these principles, at least two courts have rejected claims of RICO injury

under circumstances similar to those alleged here.  In *Heinold v. Perlstein*, 651 F. Supp.

1410 (E.D. Pa. 1987), the court found no RICO standing when the alleged injury was

that the value of a diamond ring the plaintiff purchased from the defendant was less

than (fraudulently) represented, but not less than what the plaintiff paid for it.  As the

court explained,

> [t]h[e] contract did not cause plaintiff to lose money, because
> he concedes that he did not pay more than the fair market
> value of the ring.  Since plaintiff admits that he either broke
> even or came out ahead on the deal, albeit not as far ahead

18

> as he had hoped, I fail to see what property injury he
> sustained.

*Id.* at 1411.

Citing to *Heinold*, the court in *Line v. Astro Manufacturing Co.*, 993 F. Supp. 1033 (E.D. Ky. 1998), similarly held that the plaintiff lacked standing to bring a RICO claim against manufactured home companies who allegedly misrepresented the fire safety of the homes when the plaintiff never suffered any actual fire damage.  Said the court, "although the plaintiff claims that he did not obtain the expected benefit of the bargain because the home he purchased is 'a fire trap,' he did not suffer any injury to business or property because he paid no more than fair market value for a manufactured home without a sprinkler system."  *Id.* at 1037.  Both *Heinold* and *Line* rest on the premise Defendants advance here: that "where an alleged RICO violation induces a plaintiff to enter into a contract on which the plaintiff does not lose money, the plaintiff has suffered no injury and, therefore, lacks standing to bring a RICO claim."  *Line*, 993 F. Supp. at 1037 (citing *Heinold*).

Plaintiffs cite no case reaching a contrary conclusion under similar facts. Instead, Plaintiffs assert that other courts, including the Tenth Circuit, use a more expansive analysis to determine RICO injury.  (Doc. # 23 at 10.)  The problem with the cases cited by Plaintiffs is that they all involve *tangible* loss of property.  *See Deck*, 349 F.3d at 1259 (mail fraud caused plaintiff to settle causes of action, which has been recognized as a "species of property"); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1300, 1309-10 (7th Cir. 1987) (plaintiffs fraudulently kept compressed gas cylinders belonging

to defendants without paying either rent or replacement fees).[7]  In the present case, no property has been lost or tangibly diminished as a result of Defendants' alleged actions. Plaintiffs have lost only the *opportunity* to make additional money on an investment.  In that context, cases like *Deck* are inapposite.

Plaintiffs also contend that the decisions relied on by Defendants apply a different injury analysis than does Colorado.  (Doc. # 23 at 10-12.)  Specifically, Plaintiffs argue that the cases cited by Defendants use an "out-of-pocket loss" damages rule, a more limited damages rule than the "benefit of the bargain" doctrine applied in Colorado.  Under an "out-of-pocket" analysis, a party may recover only amounts actually paid.  By contrast, Colorado recognizes that a party is entitled to recover "the difference between the actual value of the property and what its true value would have been had the [false] representation been true."  *Otis & Co. v. Grimes*, 48 P.2d 788, 791 (Colo. 1935).  Plaintiffs claim they have suffered such an injury – the difference between the actual appraised property value and the promised value based on the recorded price – and thus should be able to recover for their lost investment bargain in this RICO suit brought in Colorado.  Though an interesting theory, it ultimately fails.

Plaintiffs are correct that many courts look to state law to define whether a particular interest constitutes "property" for RICO purposes.  *See, e.g.*, *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) ("'Without a harm to a

---

[7]  Indeed, *Liquid Air Corp.* is a case about the proper measure of RICO damages awarded after trial, not about a proper RICO injury permitting standing in the first instance. Thus, it has little, if any, relevance to the issue at hand.

specific business or property interest – a categorical inquiry typically determined by reference to state law – there is no injury to business or property within the meaning of RICO.'" (quoting *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir.2005) (en banc))). But neither *Heinold*, a decision from Pennsylvania, nor *Line*, from Kentucky, discuss or even cite to state law in reaching their conclusions. Indeed, Kentucky, like Colorado, is a "benefit of the bargain" state. *Investors Heritage Life Ins. Co. v. Colson*, 717 S.W.2d 840, 842 (Ky. App. 1986) ("One induced by fraudulent representations to enter into a contract is entitled to recover as damages, not only what he actually parted with, but benefits of the bargain." (citing *Dempsey v. Marshall*, 344 S.W.2d 606 (1961))). Thus, the mere distinction between "out-of-pocket loss" states and "benefit of the bargain" states does not explain away the persuasive reasoning of cases like *Line*.

Further, Plaintiffs point to no case from Colorado that recognizes a lost investment bargain as a species of property. Rather, Plaintiffs' cases address the proper *damages* recoverable for fraud. Although injury and damages are logically related, a property interest and a measure of damages are not the same thing. The question presently before the Court is not what damages Plaintiffs are entitled to recover. Rather, the issue is whether Plaintiffs have suffered an injury to their property interests sufficient to clear RICO's standing hurdle. With no precedent to support Plaintiffs' theory, the Court declines to find that Colorado recognizes a lost investment bargain as such a property interest.

Finally, even assuming Colorado recognized such an interest, that recognition is not dispositive of the RICO standing issue.  State law is a guide to determining property in the RICO context, not an absolute rule.  As the First Circuit aptly explained,

> [s]ome role does exist for state law.  There is no general federal law of property transfers, so the question who owns a piece of property is likely to be settled by state law.  On the other hand, one might expect federal law to decide whether a given interest, recognized by state law, rises to the level of "business or property," or whether "injury" has been done to it by the acts alleged.  Where to set the "business or property" threshold depends on federal statutory purpose, and that purpose is likely to support a definition that is uniform throughout the country.

*DeMauro*, 115 F.3d at 96-97; *see also Patterson v. Mobil Oil Corp.,* 335 F.3d 476, 492 n.16 (5th Cir. 2003) (favorably citing *DeMauro*); *Doe v. Roe*, 958 F.2d 763, 768 (7th Cir. 1992) ("Of course, we are not required to adopt a state interpretation of 'business or property' if it would contravene Congress' intent in enacting RICO.").  Put another way, "even though courts may look to state law to determine, for RICO purposes, whether a property interest exists, it does not follow that any injury for which a plaintiff might assert a state law claim is necessarily sufficient to establish a claim under RICO."  *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998).  Here, Plaintiffs' asserted state law property interest consists of an intangible "lost bargain."  This is not the type of concrete loss that numerous courts have found necessary to support a RICO injury.  *See, e.g.*, *Maio*, 221 F.3d at 483 (holding that a RICO injury must be a "concrete financial loss and not merely injury to a valuable intangible property interest").  The Court finds the reasoning of these decisions persuasive and, as a result, is unwilling to

find Plaintiffs' asserted interest sufficient to confer RICO standing, even if that injury were recognized as a property interest in Colorado.

One final point bears mention. The logical corollary to the rule that RICO injury must be concrete and tangible is that it cannot be speculative. *See, e.g. In re Taxable Mun. Bonds Sec. Litig.*, 51 F.3d at 523 ("[S]peculative damages are not compensable under RICO."). Plaintiffs' basic contention is that their Marabou Ranch properties suffered injury because they were not worth as much as Defendants said they would be. But there is no allegation that Plaintiffs ever tried to sell their lots. Simply because the properties did not appraise at the represented value does not mean they could not have been sold for that value – or more. Without attempting to realize the "promised" profit, any injury would be speculative at best.

For all of these reasons, the Court adopts the reasoning of the *Heinold* and *Line* decisions. Where the value of property sold is not as high as represented, but is at least what the Plaintiff paid for it, they have not lost money on the property and therefore have not suffered an injury to business or property sufficient to sue under RICO. To be clear, the Court does not hold that expectancy interests can never form the basis of a RICO claim. Nor does the Court hold that a RICO scheme that diminishes the *actual* value of property is insufficient to support a RICO injury. *See Gillmor*, 490 F.3d at 797 (plaintiffs had standing where racketeering reduced the actual value of their land). Rather, the Court simply recognizes that RICO injury is a fact-specific inquiry, and where the RICO violation – the misrepresentation of upside value –

creates an expectation but does not lead a plaintiff to pay more for property than it is actually worth, that plaintiff has not suffered the necessary injury to property. *See McLaughlin*, 522 F.3d at 228-29 ("While we need not and do not decide whether expectancy damages are ever available under RICO, . . . in cases that sound in fraud in the inducement, they plainly are not.") (citation omitted); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1300 (6th Cir. 1989) (noting that there was no RICO injury in *Heinold* because "the fraud could not simultaneously induce plaintiffs to invest and reduce the value of the investment's object").

Because Plaintiffs lack standing, their RICO claims must be dismissed. This dismissal will be without prejudice. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction, . . . the dismissal must be without prejudice."). If Plaintiffs believe they can allege a concrete, tangible, non-speculative injury to business or property, they may file an amended complaint within 30 days of this Order.[8]

### b.    Merits

While the Court does not specifically address Plaintiffs' RICO claims on the merits, *see, e.g.*, *Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590, 592

---

[8] The Court notes that at least the Ivars' property has been foreclosed on while the motions to dismiss were pending. However, the parties have not briefed the issue of whether and how that foreclosure, and any loss of money as a result, affects the RICO injury analysis. The Court expresses no opinion on that issue, and the parties are free to raise it if and when the RICO claim is refiled.

(10th Cir. 1996) ("We do not reach the merits because we conclude that plaintiffs lacked standing . . . ."), because Plaintiffs may choose to file an amended complaint, the Court does note one obvious issue with the claims as presently alleged.  Plaintiffs do not claim that the purported scheme extended beyond selling lots in the Marabou Ranch development.  (Doc. # 10 ¶ 18.)  Moreover, Plaintiffs expressly allege that Defendants have stopped the purportedly misleading practice of recording gross sales prices and are now providing actual sales prices to prospective purchasers.  (*Id.* ¶ 34.)  Such a limited – and now ceased – course of action is likely insufficient to meet RICO's requirement of a continuous pattern of racketeering activity.  *See, e.g.*, *Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1545 (10th Cir. 1993) ("Where the scheme has a limited purpose, most courts have found no continuity."); *Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545,1556 (10th Cir. 1992) ("Plaintiffs allege what is actually a closed-ended series of predicate acts constituting a single scheme . . . to accomplish a discrete goal . . . directed at a finite group of individuals . . . 'with no potential to extend to other persons or entities.'  Thus plaintiffs have not alleged the type of activity that RICO was enacted to address." (quoting *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir.1990))).  In determining whether to file an amended RICO claim, Plaintiffs should give serious thought to this pattern of continuous racketeering requirement.

## 2.     Interstate Land Sales Full Disclosure Act

Seller Defendants[9] also move to dismiss Plaintiffs' claim under the Interstate Land Sales Full Disclosure Act (the "Disclosure Act"), 15 U.S.C. §§ 1701 *et seq.* The Disclosure Act aims to prevent deceptive practices in land sales by requiring developers to disclose material information to purchasers. *See Flint Ridge Development Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 778 (1976). Among its protections is an anti-fraud provision that makes it illegal, with respect to the sale of certain lots, to (A) employ a scheme to defraud, (B) obtain money or property by false statements or omissions of material fact, or (C) engage in a practice that operates as a fraud on a purchaser. 15 U.S.C. § 1703(a)(2)(A)-(C); *see also Rice v. Branigar Organization*, 922 F.2d 788, 791 n.4 (11th Cir. 1991) (discussing this "general anti-fraud" provision). Plaintiffs bring suit under this anti-fraud provision of the Disclosure Act. (Doc. # 10 ¶¶ 67-68.)

Defendants contend that the Disclosure Act claim is deficient because Plaintiffs cannot show reliance on any of the alleged misrepresentations. (Doc. # 14 at 12-13.) In addition to contending that reliance has been properly alleged, an issue discussed below, Plaintiffs argue that reliance is not an element of a Disclosure Act claim in the first instance. (Doc. # 23 at 20.) In support of its claim that reliance is required, Defendants point to *Bryan v. Amrep Corp.*, 429 F. Supp. 313 (S.D.N.Y. 1977) and *Gilbert v. Woods Marketing, Inc.*, 454 F. Supp. 745 (D. Minn. 1978). Both of these cases held that reliance was an element, at least as to a claim that a developer

---

[9]  This claim was not asserted against Defendant M&I Bank. (Doc. # 10 at 18.)

obtained money or property through misrepresentations in violation of subsection (B) of 1703(a)(2). *Bryan*, 429 F. Supp. at 319 ("Reliance is an element of a § 1703(a)(2) claim based on misrepresentations, at least under § 1703(a)(2)(B), . . ."); *Gilbert*, 454 F. Supp. at 749 (noting that "reliance is an essential element to plaintiffs' case under § 1703(a)(2)(B) but possibly not under § 1703(a)(2)(A) and (C)").

Although neither party discusses it, both *Bryan* and *Gilbert* were decided under an earlier version of the Disclosure Act that *expressly* included reliance as an element of a § 1703(a)(2)(B) claim. At the time, that section made it illegal for a developer to

> obtain money or property by means of a material misrepresentation with respect to any information included in the statement of record or the property report or with respect to any other information pertinent to the lot or the subdivision *and upon which the purchaser relies*, . . .

*Gilbert*, 454 F. Supp. at 749 n.4 (quoting statute) (emphasis added). The statute was amended in 1979, and the reference to buyer reliance was deleted. *See* Paul Barron et al., *Federal Regulation of Real Estate and Mortgage Lending* § 3:81 (4th ed.). In its present form, subsection (B) bars a developer from

> obtain[ing] money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision . . . .

15 U.S.C. § 1703(a)(2)(B).

In the years since this amendment, courts have been divided on whether reliance is (or remains) an element of a § 1703(a)(2) misrepresentation claim. *See, e.g.*, *Burns v. Duplin Land Development, Inc.*, 621 F. Supp. 2d 292, 305 n.4 (E.D.N.C. 2009) (noting split). Some courts have called a reliance requirement "highly questionable." *Prebil v. Pinehurst, Inc.*, 638 F. Supp. 1314, 1317 & n.1 (D. Mont. 1986) (also noting split). Others have followed the pre-amendment suggestion that reliance is only an element of a claim for misrepresentation under subsection (B), but not for any other claims. *Gibbes v. Rose Hill Plantation Development Co.*, 794 F. Supp. 1327, 1336 & n.22 (D.S.C. 1992). Still others have reasoned that reliance is a necessary element of all § 1703(a)(2) claims. *Dongelewicz v. First Eastern Bank*, 80 F. Supp. 2d 339, 348 (M.D. Pa. 1999); *cf. Degirmenci v. Sapphire-Fort Lauderdale, LLLP*, 642 F. Supp. 2d 1344, (S.D. Fla. 2009) (assuming, without discussion, that reliance is required). The parties do not cite, and the Court has not found, any case in the Tenth Circuit addressing this issue.

Considering these varied approaches, and for the reasons set forth below, the Court finds that reasonable reliance is an element of all misrepresentation claims under § 1703(a)(2). That section protects against fraud. *See, e.g.*, *Rice*, 922 F.2d at 791 n.4. "Generally, fraud consists of some deceitful practice or willful device resorted to for the purpose of inducing another, *in reliance upon it*, to surrender property or legal rights." *Brown v. Alkire*, 295 F.2d 411, 414 (10th Cir. 1961) (citing 37 C.J.S. Fraud § 1 (1943), 23 Am. Jur. Fraud and Deceit § 2 (1939), and Black's Law Dictionary 788, (4th

Ed.1951)) (emphasis added).  As explained by the District Court for the Middle District of Pennsylvania in the *Dongelewicz* case,

> [s]ubparagraphs (A) and (C) relate to the employment of fraudulent means in making the sale, and therefore would require detrimental reliance.  The proscription described in subparagraph (B) is not limited to making a false statement or material omission, but involves obtaining money or property by such means and involves examining the circumstances of the overall offer and sale or lease, as relates to any material information.  In other words, subparagraphs (A), (B), and (C) prohibit fraud.  Since establishing fraud requires proof of detrimental reliance, plaintiffs are required to so prove in this instance.

80 F. Supp. 2d at 348.  In short, a plaintiff proceeding under this anti-fraud provision must prove one of the well known elements of fraud: reliance.

This conclusion is also supported by reference to analogous federal securities laws.   For example, Rule 10b-5 uses the same tripartite "employ a scheme/make a false statement/engage in a practice of fraud" prohibition as does § 1703(a)(2), *see* 17 C.F.R. § 240.10b-5, and is "essentially similar" to § 1703(a)(2), *Gilbert*, 454 F. Supp. at 748.  Rule 10b-5 contains a reasonable reliance requirement.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988) ("We agree that reliance is an element of a Rule 10b-5 cause of action."); *see also MidAmerica Federal Sav. and Loan Ass'n v. Shearson/American Exp., Inc.*, 886 F.2d 1249, 1256 (10th Cir. 1989) ("Under Rule 10b-5, . . . a purchaser must show justifiable or reasonable reliance on the defendant's misrepresentations in order to prevail.").  Because reliance is required under Rule 10b-

5, it is logical that it be required under the nearly identical anti-fraud provision of the Disclosure Act.

For these reasons, the Court finds that reliance is an element of a fraud claim under the Disclosure Act, as it is in any general fraud claim.  Because reliance is also an essential element of two of Plaintiffs' state law claims, the Court considers these claims together.

### 3.    Misrepresentation Claims and Reliance

Like the Disclosure Act claim, reasonable and justifiable reliance is required for Plaintiffs' state law claims for fraudulent and negligent misrepresentation.  *Bedard v. Martin*, 100 P.3d 584, 592 (Colo. App. 2004) (negligent misrepresentation requires that there was false information "upon which the plaintiff justifiably relied"); *Williams v. Boyle*, 72 P.3d 392, 399 (Colo. App. 2003) (element of fraudulent misrepresentation is "the right or justification in relying on the misrepresentation").  Seller Defendants[10] contend that all three of these claims fail in light of the Marabou Homestead Purchase Agreements, which purport to prohibit reliance on any pre-sale statements concerning marketability or investment potential of the properties.  (Doc. # 14 at 13-16, 23-24.) Before turning to that question, however, the Court considers a related issue addressed at the hearing on the motions to dismiss – whether, regardless of the purchase agreements, the facts as alleged show reasonable reliance.

---

[10]  M&I is not a relevant defendant for the Disclosure Act or state law fraud claims. Again, Plaintiffs did not assert a Disclosure Act claim against M&I (Doc. # 10 at 18), and the state law claims are barred by the statute of frauds, *see supra* Sec. III.A.1.

Many of Plaintiffs' allegations of fraud focus on Defendants' statements that the actual value of the properties was reflected in the higher, recorded sale price and that the properties would appraise at this higher value. (*See* Doc. # 10 ¶¶ 27, 32.) Were these the only misrepresentations, the Court doubts that reliance would be reasonable. While Defendants allegedly withheld *their* appraisals of the properties (*id.* ¶ 32), there is no claim that Plaintiffs were precluded by anyone from obtaining their own appraisal prior to purchase. Nor is there any allegation that Defendants altered the properties in such a way that an independent appraisal would be skewed. "A party cannot say they were deceived by the other's misrepresentations where the means of knowledge are equally available to both parties and the subject matter is equally open to their inspection." *Sheffield Services Co. v. Trowbridge*, 211 P.3d 714, 726 (Colo. App. 2009) (citing *Hayden v. Perry*, 134 P.2d 212, 213 (1943)). Put simply, blindly relying on a seller's representations of a multi-million dollar appraisal value without confirming with one's own appraisal does not strike the Court as particularly reasonable or justified.

However, these are not the only alleged misrepresentations. Plaintiffs also claim that Defendants told them – falsely – that Plaintiffs were the only purchasers getting the "discounted" price, that Defendants presented pricing lists reflecting the gross, rather than actual, price paid for the other properties, and that Defendant Hillenbrand over-represented the price paid for his own lot by $500,000. (Doc. # 10 ¶¶ 22-24.) The complaint indicates that the information exposing these misrepresentations was not "equally available"; the inflated prices were recorded in the public records, meaning that

any attempt to verify the "price paid" statements through those records would have shown the statements to be accurate. (*Id.* ¶ 25.) The Court cannot say that Plaintiffs' reliance on these representations was unreasonable as a matter of law.

Defendants contend that the claims still fail because Plaintiffs disclaimed any reliance on statements of value when they signed the relevant purchase agreements. (Doc. # 14 at 13-16; 23-24.) Because the purchase agreements were matters outside of the pleadings, the Court converted the motion to dismiss to one for summary judgment on this limited issue. (Doc. # 70.) The parties were given the opportunity to supplement the record with any additional materials, which all parties did. (Docs. ## 81, 86, 88.)

Plaintiffs' purchase agreements contain identical disclaimer and integration clauses.[11] Of particular relevance, the purchase agreements provide that

> Buyer acknowledges that this Agreement is entered into by Buyer without reliance on any warranties, statements, or representations, either written or oral, express or implied, by Seller, or by any agent, employee or representative of Seller, or by any broker or other person purporting to represent Seller, relating to the suitability of the Homestead for Buyer's intended use, *the marketability or investment potential of the Homestead*, the legal or tax consequences of this Agreement and the purchase or ownership of the Homestead, or other matters, except as set forth in this Agreement between Seller and Buyer. . . . EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE HOMESTEAD IS BEING PURCHASED "AS IS," AND SELLER MAKES NO OTHER EXPRESS OR IMPLIED WARRANTIES,

---

[11] Plaintiffs do not contest the authenticity of the purchase agreements submitted by Defendants.

> INCLUDING IMPLIED WARRANTIES OF
> MERCHANTABILITY OF FITNESS FOR A PARTICULAR
> PURPOSE, AS TO THE QUALITY, MERCHANTABILITY,
> *VALUE, OR INVESTMENT POTENTIAL* OF THE
> HOMESTEAD.

(Doc. ## 14-2, 14-4, at § 7(c) (emphasis added)).  The agreements also contain an

integration clause, which provides that

> [t]his Agreement, together with all special stipulations,
> addendums, exhibits, and attachments referenced in this
> Agreement and attached, embodies the entire agreement
> between the parties and cannot be waived or amended
> except in writing signed by both parties.  Buyer agrees that
> Buyer has not been induced by or relied upon any
> information, representation, warranties, or statements,
> whether oral or written, express or implied, made by Seller or
> any other person representing or purporting to represent
> Seller that are not expressly set forth or provided for in this
> Agreement.

(*Id.* at § 16.)  Defendants argue that, by way of these two provisions, Plaintiffs have

waived and disclaimed reliance on any alleged price or value misrepresentations.  (Doc.

# 14 at 13-15, 24.)

Under Colorado law,[12] certain tort claims may be preempted by exculpatory

contractual language.  *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 73-74

(Colo. 1991) (negligent misrepresentation); *Colo. Coffee Bean, LLC v. Peaberry Coffee,*

*Inc.*, __ P.3d __, 2010 WL 547633, at *6 (Colo. App. 2010) (fraudulent nondisclosure);

*Student Marketing Group, Inc. v. College P'ship, Inc.*, 247 F. App'x 90, 99 & n.9 (10th

---

[12]  It is not clear that Colorado law governs the Disclosure Act claim.  However, as the
parties' arguments all focus on Colorado law, the Court assumes, without deciding, that
Colorado law controls.

Cir. Aug. 9, 2007) (negligent misrepresentation). However, a standard integration clause or generic "non-reliance" provision is not enough; the disclaimer must be "couched in clear and specific language" to be effective. *Keller*, 819 P.2d at 74; *see also Colo. Coffee Bean, Inc.*, 2010 WL 547633, at *6 (finding that contract containing "specific language" disclaiming accuracy of income information precluded plaintiffs from claiming reasonable reliance); *Student Marketing Group, Inc.*, 247 F. App'x at 99 (finding that contract clauses waived claim for negligent misrepresentation where warranty clause disclaimed accuracy of information, integration clause was "specific and unambiguous," and contract contained a "broad limitation on tort and negligence liability").

The language in the purchase agreements is not sufficiently clear to wholly preclude Plaintiffs' claims of reliance. The contracts speak in terms of reliance on representations of "value," "marketability," and "investment potential" of the homesteads Plaintiffs purchased. But Plaintiffs' claims are not simply that Defendants told them the property was worth X when it was actually worth Y. Rather, as discussed above, Plaintiffs contend that Defendants actively misrepresented and concealed the sales prices of *other* homes in the development, along with the widespread availability of the purchase incentives Plaintiffs were receiving. These misrepresentations are broader than mere statements about the value of Plaintiffs' properties. Assuming these allegations about broader misrepresentations are true – which the Court must do at this stage of the litigation – the contacts do not "clear[ly] and specific[ally]" inform Plaintiffs

that they were waiving their right to sue for the sort of deception they claim occurred in this case. Whether the evidence bears out this broader deception is not before the Court at this time. Thus, for purposes of this motion to dismiss, the Court cannot say that the language of the purchase agreements bars Plaintiffs' claims as a matter of law.[13]

### 4. Colorado Consumer Protection Act

Finally, Seller Defendants[14] move to dismiss Plaintiffs' claim under the Colorado Consumer Protection Act ("CCPA"), C.R.S. § 6-1-101 *et seq.* The Act is to be liberally construed in light of its broad purposes, *Hall v. Walter*, 969 P.2d 224, 230 (Colo. 1998), which include protecting consumers in a position of relative weakness, i.e., consumers lacking access to truthful information about a transaction, against a "broad range" of fraudulent and deceptive practices, *Martinez v. Lewis*, 969 P.2d 213, 222 (Colo. 1998).

To bring a private claim for relief under the Act, Plaintiffs must allege:

> (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or

---

[13] There is some question whether *fraudulent* misrepresentation claims may be waived by a contractual disclaimer. *Compare Colo. Coffee Bean*, 2010 WL 547633, at * 5-6 (fraudulent nondisclosure claim barred by specific contractual language) *with United States Welding, Inc. v. Burroughs Corp.*, 640 F. Supp. 350, 354 (D. Colo. 1985) ("[I]t is far from clear that a claim for fraudulent misrepresentation should be treated in the same manner as a claim for negligent misrepresentation, even where there is a disclaimer."). However, given the Court's conclusion that Plaintiffs' allegations survive the waiver argument, the Court need not decide this issue, at least at this stage of the litigation.

[14] Again, M&I is insulated from this state law claim by the credit agreement statute of frauds, *see supra* Sec. III.A.1.

> potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Crowe v. Tull*, 126 P.3d 196, 201 (Colo. 2006) (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003)). Defendants challenge the injury and public impact elements.

Defendants first contend, cursorily, that they did not cause an injury to any legally protected interest because the Marabou Ranch property is not alleged to be worth less than what Plaintiffs paid for it. (Doc. # 14 at 27.) Their argument simply references the portion of their brief discussing injury in the RICO context. However, unlike RICO, the CCPA contains no requirement of injury to "business or property." *See, e.g.*, *Hall*, 969 P.2d at 236 ("The CCPA does not specify injuries against which it is intended to guard."). Rather, the CCPA injury element derives from Colorado's basic standing requirements outlined in *Wimberly v. Ettenberg*, 570 P.2d 535 (Colo. 1977). *See Hall*, 969 P.2d at 235. The *Wimberly* test provides "a relatively broad definition of standing that has traditionally been relatively easy to satisfy." *Reyher v. State Farm Mut. Auto. Ins. Co.*, __ P.3d __, 2009 WL 4981898, *3 (Colo. App. 2009) (citing *Ainscough v. Owens*, 90 P.3d 851, 855-56 (Colo. 2004)). Plaintiffs allege that they would not have purchased the property – and thus parted with their money – but for Defendants' fraudulent representations. (Doc. # 10 ¶ 35.) Plaintiffs may not have alleged a clear "injury to business or property" under RICO's statutory scheme, but given the low

standing threshold in Colorado, they have asserted sufficient injury to bring a claim under the CCPA.

Defendants also argue that Plaintiffs have not alleged a significant public impact. This requirement keys in on the Act's purpose of "regulat[ing] commercial activities and practices which, 'because of their nature, may prove injurious, offensive, or dangerous to the public.'" *Rhino Linings*, 62 P.3d at 146 (quoting *People ex rel. Dundar v. Gym of America, Inc.*, 493 P.2d 660, 667 (Colo. 1972)).  Thus, the CCPA "can not be used to remedy a purely private wrong." *Crowe*, 126 P.3d at 208.  In assessing public impact, Colorado courts look to three specific factors: "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." *Rhino Linings*, 62 P.2d at 149 (citing *Martinez*, 969 P.2d at 222).

Plaintiffs contend that they pled public impact in paragraph 80 of their amended complaint.  (Doc. # 23 at 32.)  That paragraph merely asserts that "Plaintiffs are informed and believe, and on that basis allege, that Defendants' acts and/or omissions injured Plaintiffs and other actual or potential consumers of Defendants' goods, services, or property."  (Doc. # 10 ¶ 80.)  This "'formulaic recitation of the elements of a cause of action'" does not pass muster.  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).  Defendants, on the other hand, assert that the complaint asserts no

impact on anyone but Plaintiffs.  (Doc. # 14 at 27.)  This, too, is wrong.  The complaint

does allege some public reach to Defendants' practices.  The question is whether those

factual allegations are sufficient to meet the requisite pleading standard, that is, whether

the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim for

relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S.

at 570).

Although the complaint contains numerous references to the public being

exposed to Defendants' allegedly fraudulent practices, most are little more than

conclusory contentions that the public was harmed.  (*See, e.g.*, Doc. # 10 ¶ 25 (alleging

a "deliberate and fraudulent scheme to deceive the public and convince prospective

purchasers that the lots in Marabou Ranch were worth more than they were actually

worth").)  Such statements are insufficient to state a claim.  *Iqbal*, 129 S. Ct. at 1949

("Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice.").  Stripped of these bare statements, though, the

complaint does allege – as fact, not conclusion – that Defendants distributed

advertisements containing false pricing information "to various agents, brokers, and

purchasers, reaching as far as California."  (Doc. # 10 ¶ 47 (a), (b).)  While not alleging

the specific number of potential purchasers affected, this claim suggests a broad

scheme.  *Cf. Hall*, 969 P.2d at 235 (noting that defendants' practices "implicated the

public as consumers because the misrepresentations were directed at the market

generally, taking the form of widespread advertisements and deception of actual and

prospective purchasers").  Moreover, there is no allegation that Plaintiffs or other prospective purchasers were sophisticated business people, real estate professionals, or anything other than people with money to invest.  *Compare Rhino Linings*, 62 P.3d at 150 (no public impact where, *inter alia*, the plaintiffs were "represented by counsel in negotiations with [defendants]" and "relatively sophisticated in his education and knowledge of the business of selling [the product in question]").  Finally, read in the light most favorable to Plaintiffs, the complaint alleges that ten or so unwitting consumers had previously bought property in Marabou Ranch under the mistaken impression that land values were higher than they actually were.  (Doc. # 10 ¶¶ 18, 46.)[15]  These factual allegations demonstrate more than a "purely private wrong," *Crowe v. Tull*, 126 P.3d at 208, and thus are sufficient to "nudge[ ] [Plaintiffs'] claims across the line from conceivable to plausible" – barely.  *Twombly*, 550 U.S. at 570.  Discovery may show a more limited reach to Defendants' advertising or a higher level of sophistication of the prospective purchasers, but at this stage of the proceedings the Court cannot find it implausible that a public impact has occurred.

For these reasons, Defendants' motion to dismiss the CCPA claim must be denied.

---

[15]  Defendants suggest that the only purchasers of property prior to Plaintiffs were "insiders" who knew of the alleged scheme.  (Doc. # 14 at 27.)  The complaint alleges that initial sales were to insiders, "including" five specific lots.  (Doc. # 10 ¶ 18.)  The complaint goes on to assert that a total of sixteen properties were closed on before Plaintiffs' purchase.  (*Id.* ¶ 46.)  Although somewhat imprecise, drawing reasonable inferences in Plaintiffs' favor, as the Court must, these paragraphs fairly assert that while a few insiders bought in early, the other properties were purchased by investors in the same position as Plaintiffs.

## IV. CONCLUSION

On a motion to dismiss for failure to state a claim, the question for the Court is whether the complaint alleges facts – assumed to be true – that plausibly state a claim for relief.  Given this standard, most of Plaintiffs' claims are sufficient to survive the motion to dismiss.  Accordingly, it is

ORDERED that Defendant M&I Bank's Motion to Dismiss (Doc. # 15) is GRANTED in part and DENIED in part.  The motion is granted as to Plaintiffs' state law claims.  Those claims are dismissed with prejudice in light of the Colorado Credit Agreement Statute of Frauds.  The motion is denied as to Plaintiffs' federal RICO claim. The motions to strike and motion for a more definite statement are also denied.  It is

FURTHER ORDERED that Defendants' Motion to Dismiss (Doc. # 14) is GRANTED in part and DENIED in part.  As Plaintiffs have conceded their Securities Act claim, the motion is granted as to that claim, which is dismissed with prejudice.  The motion is also granted as to Plaintiffs' RICO claim.  That claim is dismissed without prejudice for lack of standing.  Plaintiffs may file an amended complaint within 30 days of the date of this order.  The motion is denied as to Plaintiffs' remaining claims for violation of the Interstate Land Sales Full Disclosure Act, fraudulent misrepresentation, negligent misrepresentation, and violation of the Colorado Consumer Protection Act.

DATED:  March 30, 2010.

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge